The afternoon is in re of the Marriage of Allen. That's 410-0108 for the appellate, Mr. Scott. If I have to leave, Mr. Shuring, you may proceed. Yes, please, counsel. Initially, I'd like to introduce one of my associates, Mr. Joshua Watson, who is a recent graduate from the University of Illinois that's working in our offices and worked on this. Welcome. And I wanted to introduce him to members of the court. We have brought this action alleging a couple of errors on behalf of the trial court. And the first error had to do with a delusion in the property division of an appreciation of value of a tire business known as Allen Tire. I think the court made a couple of errors when it did its analysis, and I admit it was a hard case for the trial court. But the first assumption, or one of the assumptions the court made, was inclusion of $130,000 of goodwill in the value of the company that the court used to say was enhanced by the efforts of Mr. Allen and his brother. Two errors the court made. First of all, it started with a figure by Mr. Mudd, who was an accountant that was brought in by Mrs. Allen. And he assumed $200,000 because that was a figure that was used at the time a previous part of the business was sold some years prior to the time of this hearing. Two errors in Mr. Mudd's reasoning. First of all, he took the $200,000 without any type of basis in tying it to the business of Allen Tire at the time that he evaluated it. Second thing was, as he said in his testimony, he said, I just assumed that in the $200,000 that they would be giving covenants not to compete, and then therefore I figured that the $200,000 would be good if it was good for the father's business, it would be good for the resulting son's business. As we know, in TALTI, there is a requirement that makes a court make a determination between enterprise goodwill and personal goodwill. Just by Mr. Mudd's statements, he's assuming it's personal goodwill. Personal goodwill would be tied into a covenant not to compete. Were you the trial counsel? No, I wasn't, Your Honor. What was the position of Mr. Allen at the trial level? Was this all explained and argued to the trial court? I must say this argument was not explained to the trial court, Your Honor. Well, it was. But I think that- Was there an argument about- There was an argument that there was no goodwill. There was an argument that the business was totally non-marital and that they were adequately compensated, and those are our two arguments here. So the goodwill argument was raised at the trial level? It was raised, but it was not raised the way that I have raised it here. The Talty case was not discussed, and enterprise goodwill was not discussed. In fact, there was no evidence of enterprise goodwill. There was no- as required, I think, by Zells and Talty, and I think that's an error. What the trial court did, and another error that was made by Mr. Mudd initially and was adopted by the trial court, was Mr. Mudd did what was called an adjusted book value of the company. And an adjusted book value, as he admitted in his testimony, under accounting principles, does not add in a goodwill factor. It takes the company's book value, which is hard assets, debts, and adjusts them up to current value. If you throw goodwill in there, that's not on a balance sheet. Goodwill is determined when there is a going concern type of valuation. And Mr. Mudd said he couldn't do that type of valuation because this company didn't show income. If we agree with your argument that goodwill was improperly considered, what's the remedy you're suggesting to this court? Well, Judge, what that would do would lower- there's two other things it would lower, but it would lower by $130,000 from the start figure before you take off the non-marital contribution that the court found from his father to them in a gift. But it takes $130,000 off of the starting figure that you would look at when you make an analysis. And I set forth that- actually, if you look on page 26 of my brief, I kind of summarize that. There were two other factors that the court didn't- that included in the start figure, and that was a $30,000 truck that was bought for from funds of his father, which were traced to a specific check, and another was a $7,400 of property that belonged to the brother that was included in the appraisal. Now, Michelle is a cross-appellant here, and one of the things she raises concern about was the failure to award any maintenance for this marriage, which was some long years, Mr. Scott. If I understood the trial judge's ruling, part of his decision not to do that included the evaluations that you are now questioning. I agree with that, Your Honor. That was part of his analysis. So, if we were to agree with your aspect of this argument, why wouldn't it be appropriate to send it back with a re-evaluation of the question of maintenance? The court could do that. But part of what you would have to look at is the overall picture. I'm still proposing that she gets 60% of the assets, which, if you look at the numbers when I'm finished, still gives her a couple hundred thousand dollars in addition to a paid-for home. And also, you have to look at the fact that not only does she need maintenance, but what does Mr. Allen have to pay maintenance with? Well, this is one of those strange cases where the assets are enormous and somehow the cash flow is very minimal. I've heard stories about cases like this, and I can't quite figure it out. Mr. Scott? I would admit, Your Honor, that from the size of the able or the money that came into the company and the income shown on the tax returns, they were able to accumulate a lot of assets. Most people who earn $20,000 a year don't live like these folks. No, Your Honor, they don't. But one of the issues that comes up is if you follow it through and the court has overvalued the business itself, which I think it has, it would lower the inclusion to the sum of $178,872 instead of the figure used by the court. And then, in turn, you come to, was the compensation actually paid during the time of the party's marriage that adequately compensated Mr. Allen? And that comes into the point that these parties, Mr. Allen's average earnings during that time period were $34,000 a year. If you add back the, he also, there was a withdrawal from an investment account of $110,000, and if you average that over the 10 years that he owned it, that would bring his salary up to $40,000. And then, if you add back what she says, where basically they were running personal business, personal expenses through the business. So they were charging things for their home that was being paid for by the business. And that would bring his salary up to close to $60,000. The evidence, there's no evidence in the record that would show what a reasonable salary would be for a person running a record business and a tire business. I think that was essential to support their argument that he is underpaid. You just can't come in and say he's underpaid. And I think the court accepted the argument that he's underpaid just because of the fact that maybe it was looking at base salary. But I think that the court can re-look at that as to the position of the amount of funds that were actually taken out of investment, the amount of funds that she says were being used on an as being run through the business and not included in their income. If you look at all that, Your Honor, we believe that there is a showing that he was adequately paid, that the family adequately received compensation from the operation of the tire business. As such, we would ask the court to review our reduction based upon inclusion of capital gain, excuse me, of goodwill, and then order that no reimbursement to the estate be made. The next area where we felt that the court did not properly rule is in the area of the farmland. And there are four farms. And I'll refer to them by the names used in the trial court. The first one is the Dimmitt D-I-M-M-I-T-T farm. And this one was purchased in 1991. And that was bought for $92,000. The court included that as 100% marital. And I think that the court didn't properly consider the evidence before it. The testimony, and the only testimony concerning his purchase, came from my client and his father and his brother, who all said that the funds came from the dad. Now, the trial court said, well, that's the only evidence I got. And I don't even think it arises to the preponderance of the evidence. But if you take that evidence together with his income that he was receiving, I think it does rise to the conclusion that this came from the dad. Because the evidence that came into court was this. Prior to the time of the purchase of Dimmitt, they were making $18,000 to $21,000 a year in wages as an employee of the father. Now, they're not going to save $92,000 between he and his brother. Secondly, as soon as they bought the farm, in order to operate the farm, they had to have fertilizer paid for each year. They had to buy equipment. They bought cattle. All of this was bought by dad for the Dimmitt farm. So if they had the funds to buy the farm of $92,000, then why would dad have to keep feeding that? Or why would they have to keep paying that? So based on the totality of the evidence, it is obvious the only money that was available was dad's. So when they testified and said, we didn't have any money to buy Dimmitt, then the court has to look outside of that and see if there's anything else that supports it. Well, the lack of income and the father paying for the farm expenses supports that. Contrary wise, there's no evidence. So these were gifts from the father? Yeah. Any estate gift tax returns done, Mr. Scott? No. Gee, an oversight. There's the tax situation and the person doing the taxes I'm not here to represent. Because of course, that would be some suggestion to gee, maybe this was somehow given the familial relationship, this was sort of hidden wages or income to the son as opposed to just a gift. Well, I think that the court correctly ruled that wasn't the case. The father had an account that had all three children on it. And all three children, not even just the sister, also got funds out of there. So it was whether I agree with the court or the tax law, there should have been some type of gift tax reporting or something being done by the father as in accordance with the tax law. So the Dimmett farm, I think, should have been deemed to be non-marital. Then the Tedrow farm is a farm that is the second farm. They bought that contract for deed for $387,000. There's no question that the father provided the $167,000 and some odd dollars as the down payment. What the court did then is say, okay, we took that percentage and the balance is marital. And there's no question that the balance of the $387,000 was paid for by farm income. There's no question in the record and we're not saying that's a question. All I'm saying is when you look at this, the court didn't adjust at all on that percentage because of the non-marital portion of the property generating money to pay for the farm. Now, again, Your Honor, this was not something that was argued. It was not something that was before the trial court. But the law is that earnings on non-marital property remain non-marital. And what I did in my analysis was take a simple 50-50 crop share, which is very common if there's not a written lease and a cash rent situation, and I just did calculations based upon what would happen if you took the remaining purchase price, $218,000, and you applied the income off of that based upon a non-marital marital relationship of ownership. And I think that that's the proper way to do that, given the fact that the non-marital property earned income in and of itself as farmland. And when the court just takes the percentage of ownership times the farmland, it removes the ownership that was generated through non-marital farm income. Mr. Scott, before you go on to your next point, I want to ask, is my understanding correct that Michelle was, what, 20 years old when she married Richard in 1985? That's my understanding. And it was 21 years later that this divorce ensued. Yes, sir. They had two children who are now adults. They're both adults and the daughter's out of college. She was in college at the time. Michelle has no college education? She's in the process of this marriage. Was she employed outside the home? She was employed part-time for a number of years at the company. It's actually a family concern? Yes, but outside of that, no. I'm just curious, you're one of the senior members of the divorce bar in this area. No many 21-year marriages under these circumstances where there's been no maintenance order? No, Your Honor. Okay, just thought I'd ask. But there is, when there is a disproportionate, I am aware of situations with a disproportionate level of assets where maintenance has not been ordered. I think we've argued a couple of them up here in the Liefers case, and I can't remember if either of you just were on that, but that was another situation that was similar to that. I think, again, it gets to the balance of the amount of he could pay versus not pay. And again, Judge, with regard to the last farm that was in question, it's the Phillips farm, and the Phillips farm was bought later in the process. It was the last farm that was purchased, and again, I think the argument is that the non-marital portion of farmland, which totals about 68% of the farmland, that income that was generated off of that paid for in America. And it was obviously bought with farmland income, and we think there should be adjustments on that. And at the end, Judge, we believe that the adjustment that should be made would be give Shelley 60% of the assets. And we would suggest to the Court that that would mean that we would have a payment to her of $210,000 if you follow through all of our reasons. That's our argument. Any questions? Thank you. May it please the Court, Mr. Scott. Excuse my voice, but I've had a cold for the last eight weeks, I believe. Eight weeks? I have. Goodness. I'm glad you're at a distance, Mr. Sherrick. I will. The issues before the Court are many. We have filed a cross-appeal and have requested relief in four different areas, or five different areas. To begin with, I would state that this case began some four years ago when the party separated in December of 2006. And at that time, Michelle and Rich were residing in Quincy, Illinois, where they had moved to and purchased a $300,000 residence in, I believe, 2003. In preparing for the argument today, being the trial attorney and had been with this case from the beginning up until now, I sort of took a step back and looked at it and tried to rationalize, in my mind, number one, why we're four years down the road and we're still in this litigation. And in so doing, I came to the opinion, and I would state to the Court, that much of the issues in this case, not having been resolved over a period of time, which resulted in many motions to compel, many discoveries, many subpoenas, had to do with the credibility of Mr. Allen. And I think that is a very important issue in this case. I think even Judge Roseberry, in his opinion, addresses that issue of credibility or talks about it. I have mentioned in the brief that we have filed approximately 12 specific areas of where I believe Mr. Allen's credibility is at issue. And I think the most glaring has to do with Allen Tire. And I would like to address that and make special reference to that. The Court would recall Allen Tire was, or part of it, was sold to Ben Tire in 1999. And as a result of that, there was a dispute between Jess Allen, the father, Greg Allen, the brother, but also Rich Allen. In 1999, in April, it's clear from the evidence in this case that Rich Allen and Greg Allen began or continued with this Allen Tire. Subsequently, there was a lawsuit filed by Ben Tire. And they sued both Rich and Allen for a violation of the covenant not to compete. And that case went to trial. They were successful in that case in that the court did not grant the relief to Ben Tire. One of the central issues in that case was whether or not the inventory, the assets, receivables, were in fact given to Rich Allen and Greg Allen or whether or not they were purchased. In that case, and I have attached to the appendix a testimony from Rich Allen, he specifically stated that the inventory was leased. He, for a dollar a year, and that the equipment was going to be eventually purchased. He was asked in regards to the sale of that equipment and he said, yes, the equipment was going to be sold. So, in Ben Allen, or the Ben Tire case, we have a situation where Mr. Allen was testifying at that time that, no, this is an arm's length transaction, that we purchased the inventory, the equipment, and it was not a gift. Now we get to his testimony at the trial, at the divorce trial, the hearing before Judge Roseberry, and not only his testimony, but also his pre-trial affidavit is in complete opposition as to what he said in the case involving Ben Tire. Did you call this to the attention of Judge Roseberry? Yes, we did, John. In fact, Mr. Allen was questioned about it. The transcript from that trial, we asked that Judge Roseberry take additional notice of that, which he did. But I think that is very important in regards to… Then, is there any reason to think that Judge Roseberry, in his extraordinarily detailed and careful assessment of, I don't think I've seen anything like this, 22 single spaced pages of analysis in this case, that he somehow missed any of this or didn't consider it when he came up with his resolution? Well, again, I think if… I realize that the trial judge is the judge of the credibility here. And again, I think we had 17 days of trial in this case. These issues were brought up for him. Each side's summation… Let me be more specific. Is it your position that Richard Allen is a liar, and his testimony is unworthy of belief, and the trial judge mistakenly believed him? Yes. After all of what you presented? Yes. And 17 days worth of looking at this guy? Yes. I do. I really do. As I had occasion to mention earlier today, though, counsel, this is a panel of 45 years, if my addition is correct, cumulatively of trial judges. Much less 17 days worth in a given case, and Judge Roseberry obviously gave this case serious attention. If nothing else, that's what this written memorandum order suggests. And we all know personally how much better his assessment and view is of everybody here. And to decide, if you believe a particular witness on one point, on another point, not on a third point, and so forth, how are we supposed to second guess him? Merely because, as you pointed out, there were inconsistencies or whatever that he heard, that the judge heard. How are we supposed to say, but you made a mistake in believing any portion of it? Well, again, I think from what we have outlined in our brief and in our summation that we submitted, we believe that there is sufficient facts that were presented that go against the manifest weight of the evidence and his assessment of the credibility of Mr. Allen. I mean, I could go through many, many things in regards to income being recruited. But the judge's basic position is the judge was wrong in believing anything he said about this? Yes. How do we reach that conclusion? I think from the record, from the facts, from his testimony, from the showing of what, I mean, this was, again, I've never quite had a case like this with, you know, it's sort of, catch me if you can. And even after the last hearing that we had, I get an anonymous envelope with a check in it, or grain check, able to Brooks Allen, that I moved to reopen. It's all in the record, counsel? We had a hearing on that. But again, I mean, that is an issue that was presented. All that, I think, goes to his credibility. And we think that Judge Roseberry, you know, his consideration of Mr. Allen's testimony, you know, that he did not give proper consideration to his credibility. And, you know, the issues here, you know, we talked about the loans. They're, you know, loans going from 1991. There is no note. There is no payment. There's no agreement to interest. There is no ask for payment during this entire period of time until this divorce is filed. The same thing with what they report to be the gifts. On any of the checks that were out of Allen Tire, there's nothing to indicate that this was a gift. There's nothing on the memo. They're not written by Les Allen. They're written by Rich Allen. Out of Allen Tire, there were a few checks written out of this investment account that did have the name of the three children on it. But there is, you know, primarily all of the monies that came out of that, came out of Allen Tire, written by Rich Allen. And, you know, it's been our theory in this case, throughout the litigation of this, that what, in fact, this amounted to was income to Rich Allen from day one. We have attached to the brief that we filed a summary of the income that was generated by Allen Tire over the period of time from 1991 through 2000. And it shows that in three years, 90, 91, 92, or 90, 91, 92, and 93, he received $11,440 per year gross. And at that time, he was married and had two children. And living rather comfortably. Very comfortably. They had a house in Pittsville. They paid cash for a pool. And over the period of time that they were living together, they traveled extensively to Europe, Shelly and her daughter, and to Mexico. So, you know, it's been our theory all along that the monies that were received by both Rich and he to purchase the farms were, in fact, not gifts, but were income to the both of them. That's why we believe... Well, how about the fact that when the person giving this money is your parent slash employer, that maybe it's not totally clear what all that means. That is the dividing line. You may very well be correct in part, but it's conceivable that maybe, I don't know any of these people, but let's assume the father, Les, I believe, is the father. He's just a control freak. He likes to be a very generous source of money, but not to give anyone real claims to it. So he pays his son $18,000 and gives him $150,000. You know, is that income or is that... should some of that be income and all the rest of it? I don't know, but it seems to me that in a complicated sort of case like this, with 17 days worth of hearings, that's an issue that the trial judge should resolve. And the other thing, it appears, Mr. Sherry, that Judge Roseberry was fully... there's no aspect of this case that seemed to have escaped his scrutiny. Well, I think in regards to your question about the income, I think, you know, we have a situation where we basically have two different presumptions. One, that the farms were no question purchased during the time of the marriage, and the business Allentower Inc. was established during the time of the marriage. And we have the presumption of the monies given to them by their father, Les. That's their theory of the case. But I think then we add in the balancing of these two presumptions, and we look at the fact that both Rich and Greg were employees of this business, and looking at their income, looking at their lifestyles, was this income? I believe it was. It was contributions to them for the services over the years that they performed. You know, there's no way we can say, okay... Well, if the father said, work for me, I'm going to give you $11,000, and after that, if you do that, or $18,000, just tell me what money you need, I'll be able to give you money to live comfortably. Would all the rest of that money be income, or is it a gift? Well, how do you know? I mean, that's... That's why we have trial judges hearing the witnesses and deciding these things. He said that. He was very suspect of their income on at least two or three different occasions. Yes. So, you know... But not apparently suspicious enough to change the order to your liking. Well, again, I mean, he ruled that some of the properties, some of the farms were marital. He... On the Dead Will Farm, he awarded some of that as being marital. On Allen Tire, you know, the whole decision... But in fact, the scenario I described, it would be gift, not income, wouldn't it? Work for me, I'll give you whatever money you need. I'll pay $18,000, and, you know, it's not as if he's their father and son. I'll give you whatever you need, go live comfortably. You know, again, I think that's... I don't know that that's income. Well, it was not treated as income by them, obviously. There was no tax returns filed. But I think that is stretching what, in fact, did occur. Mr. Allen testified he worked some 44 hours a week there, making $11,400 a year. So, you know, how much of the money can we attribute to be income, or how much gift? I don't think, you know, using your scenario, I don't think we can come back and say, well, it's all gift. I mean, there has to be some equity here in this 24-year marriage to look at the... what did, in fact, occur from 1991 or 1989, really, up until 1999 when the business was sold, or part of the business was sold. And, you know, the other thing in regards to the business, you know, that was... He continued this business in 1999, but purportedly Mr. Les Allen is out of the business, but yet he reports the income, which I believe in one year was like $90,000, when he had nothing to do with it. And the business is then incorporated in 2002, again at the time of the marriage. And Judge Roseberry found that the business to be non-marital based upon the transfer of the inventory and accounts receivable and the checking account to them, which totally contradicts what Rich Allen said back in the Ben Tyra case. By the way, before I forget, and I know you have other things you want to say, but I don't think you've addressed the goodwill argument of Mr. Scott, and that seems to be pretty significant, where the trial judge did not properly evaluate the Paul T. cases he's argued and so forth. Well, I think in this case, and I was going to address that, is no question very unique. First of all, Mr. Allen did not have any expert testifier put an evaluation on the business. And I would refer the court to Mr. Mudd's evaluation. He's a licensed CPA, he's done evaluations before. He begins and states, the problem with his evaluation method of Alan Tarr would be the lack of reliability of available financial information. He states, based upon the tax returns filed by Alan Tarr, it's a company that incorporated in 2001 and has only shown a profit of $303 in six years. He talks about, in his analysis, Exhibit 14 that we introduced, which is a summary of known cash tickets not recorded as income in 2003 that totaled $48,000. He addresses an investment account which was opened in 2005, a total of $288,629.34 was deposited in this account in a very short period in 2005. He states, the assumption that large sums of money are not being reported by the corporation is supported by Exhibit 16, showing that very few cash deposits are made by the company in a business that should have a fairly high percentage of cash receipts. Judge Roseberry did address that and said gross income of $500,000 to $600,000 and said it's very suspect that there's only $2,000 to $3,000 of cash receipts annually that is deposited. He states, Exhibit 16 and Exhibit 18 further show the complete disregard for paying taxes on earnings by large amounts of personal expenses paid by the company. Then he states, the problem with valuing a company such as this is the potential of civil and criminal charges by the Internal Revenue Service for tax fraud and by the state of Illinois for both income and sales tax fraud. That is what he was dealing with and I appreciate Mr. Scott's argument in regards to goodwill. I totally understand the personal goodwill, the enterprise goodwill. I think there was a variance that he used. I think it's a fair assessment of the valuation of this company, taking into consideration everything that was given to him, what we had. You know, Mr. Allen, Rich Allen, Les Allen, did not have any records or books. They had no farm accounts. They had journals. The only thing they had was a checking account with the farm, a checking account with the business. They co-mingled all of the monies that they received from both. So, again, we are asking, based upon the evidence that the trial court did, in fact, here in this case, over an extended period of time, that the court review it and consider whether or not the trial court did or failed to reach a decision based upon the manifest weight of the evidence. And, again, I appreciate the court's remarks in regards to credibility, but I think it is an issue that Judge Roseberry did not properly address. Thank you, counsel. Thank you. I would just point out a couple of things that I noticed from the record that I think get a little bit muddled at times. At the time prior to the purchase of the first farmland, the parties were making about $18,000 a year, not $11,000 a year. And at that point in time, they lived in a simple home, if you can call it simple compared to the last home. And then they went from that home to the next home in Pittsfield, which was a step up, and both parties acknowledged that they had borrowed money from the father. The other thing that I noticed from the record was that the checks came out of this father's investment account, for the most part, and they were labeled as exhibits, thousands of exhibits with checks. But they had quite a few checks of where he wrote checks out, and they tied into these loans. What do you mean he wrote checks out? Who's he, and what does writing a check out mean? Well, what they did is they, at the time of the purchase of the home, the money came from the dad's account, is I guess what is a better explanation. Okay. And the father testified specifically, he had in his rules, like you were talking about, his rule was, if it was associated with the farmland, I'm giving it to the boys. If it's associated with one boy's house or another boy's house or the daughter's house, that's a loan they've got to pay me back. And that's the way he treated it. And part of that is supported by the testimony of Mrs. Allen and Mr. Allen. I agree that this court should not step into the shoes of a judge that is listening to 17 days, examining faces, watching body language, listening. And this judge obviously paid attention to a lot of that. He did make findings with regard to difficulties he had with Mr. Allen. He also made findings as to the father. And times that he felt the father was, you know, his testimony was supported. And findings about Mrs. Allen. So I think that credibility can only be determined by a trial judge. I don't think we sitting back, or me reading a record, or you reading a record, can get the feel that a trial judge feels when they're making these discretionary determinations. And that's probably the reason for all of your rulings with regard to credibility. I would point out one of the things brought up on Brooks Allen as an afterthought with regard to the grain, that was brought back before the judge. And what the evidence was is that Brooks Allen had worked for two years for them on a growing season, was entitled to funds from the grain for his work on the farm. He tried to buy a farm, couldn't pay for it, worked the farm, and he ended up with getting money for working the farm for the year. And the rest of the money came back to the Allen brothers. So, I mean, that was dealt with. It wasn't as if it was some big backdoor thing. It was something that they were doing between the two brothers and the son. But those are the additional comments. Thank you. Thank you, counsel. We take the matter under advice.